UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO: 1:17-CR-00111 (RJL)** |
| | : | |
| v. | : | |
| | : | |
| **ALEXANDER GULINO,** | : | |
| **Defendant** | : | |
| _____ | : | |

## GOVERNMENT MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing for Alexander Gulino ("Defendant"). The government recommends the Court impose a sentence of ten (10) months imprisonment with a three (3)-year period of supervised release. Further, the government recommends the court order restitution in the amount of $132,024.54 to Defendant's victim. The government submits that this sentence acknowledges the seriousness of the offense, factors identified in the Pre-Sentence Investigation Report ("PSR"), and 18 U.S.C. § 3553(a) factors. In support of this motion, and to assist the Court in fashioning and appropriate sentence, the Government submits this memorandum in aid of sentencing.

### I.   FACTUAL BACKGROUND

This case is about Defendant's use of his position as a trusted employee to enrich himself at his employer's expense.[1] Had this case proceeded to trial, the evidence would have shown that between at least March 2012 and August 2015, Defendant concocted and executed an elaborate scheme to defraud Neiman Marcus of at least $132,024.54 by executing fraudulent and

---

[1] Although this response uses the term "abuse of trust" with respect to Defendant's actions, the Government does not assert or otherwise advocate for an "abuse of trust" enhancement pursuant to the Sentencing Guidelines.

unauthorized customer returns and pocketing the money for himself. Indeed, the evidence would have shown that Defendant executed more than 300 fictitious returns ranging in value from $300 to nearly $1,000. Defendant took the cash for himself and transferred it across state lines in violation of 18 U.S.C. § 2314. In the process, Defendant betrayed those who looked up to him, as well as those who trusted him to do what was right.

As loss prevention officer for Neiman Marcus's Washington, D.C. location, Defendant managed a staff of investigators and security personnel responsible for identifying and ameliorating thefts by Neiman Marcus customers and employees alike. Defendant oversaw Neiman's security apparatus, including the location of surveillance cameras and various other initiatives designed to reduce in-store thefts. Further, Defendant conducted investigations into customer and employee misconduct, and worked with local law enforcement, including the Metropolitan Police Department (MPD) and Federal prosecutors, to hold perpetrators accountable.

In addition to serving as Neiman's loss prevention officer, Defendant also served as the *de facto* manager of the store's customer service department. As customer service manager, Defendant gained access to certain of Neiman's computer systems and functions which he otherwise would not have been able to access as loss prevention officer. Moreover, Defendant had first-hand knowledge of how to execute customer returns and, indeed, Defendant was sometimes responsible for training and reprimanding customer service employees as to the proper processes and procedures.

The evidence at trial would have shown that, to execute his fraud, Defendant used his status as loss prevention officer to access Neiman's retail tracking computer system which stores sales data for every item sold, returned, or otherwise at any retail location in the United States. This data included, but was not limited to, the item's sales price, the date the item was sold (or returned),

the name of the original salesperson, the customer's method of payment, and in some cases, limited additional personal identifying information belonging to the customer. Defendant then used the system to identify customers who had purchased a retail item, or items, at least 180 days prior to the date of his intended theft. Of those customers, Defendant narrowed his search to those customers who made their purchases from a Neiman's salesperson who was no longer employed by the company. This detail was important to Defendant's scheme because Defendant had concluded that customers who purchased items more than 180 days prior to his theft were less likely to execute a legitimate return in the future. This would have had the effect of uncovering his fraud. Moreover, Defendant avoided executing returns connected to then-current sales persons because it could impact the sales person's commissions which could have also exposed his scheme.

Once he identified a sale that met the above referenced criteria, Defendant used his status as customer service manager to access the company's separate retail sales register to execute the fraudulent return. Specifically, Defendant entered the name of the purchaser and located the specific purchase or purchases Defendant wished to refund. Defendant completed the fraudulent return by indicating that the refund should be made in cash. Defendant then removed the cash from the cash register, placed the cash into his pocket, and shredded the refund receipt in an effort to cover his tracks.

It took Neiman Marcus a considerable amount of time to discover Defendant's scheme. There is no doubt that Defendant's dual-role as loss prevention officer and customer service manager assisted in concealing Defendant's criminal conduct. Not only was Defendant a step-ahead of Neiman's security procedures and protocols, but store security officials also inherently trusted Defendant and were reluctant to believe that he would steal from his decades long

employer. It was not until Neiman's acquired a proprietary security software technology that it was able to observe abnormalities in Defendant's return activity.

Because of Defendant's position, Neiman's had to take elaborate measures to catch Defendant in the act. The security team installed undercover surveillance cameras without Defendant's knowledge so that back areas of the cash office would be recorded. In addition, security personnel used special equipment to monitor Defendant's key strokes at cash registers Defendant used to conduct the fraudulent returns. On August 28, 2015, Defendant was captured on surveillance video and through live key-stroke monitoring equipment, executing a fraudulent return for a handbag purchased from a Neiman Marcus store located in Fort Lauderdale, Florida and with a retail value of $466.00. After executing the fraudulent transaction and placing the proceeds into his pocket, surveillance video showed Defendant walk to a back room and shred the receipt associated with the fraudulent transaction. On the same day, and not more than ten minutes after his first fraudulent return of the day, Defendant was captured on surveillance video and through live key-stroke monitoring technology executing a second fraudulent return for a blouse that had been purchased from the Washington, D.C. store and with a retail value of $295.00.

While Neiman Marcus's fraud detection data only returned analytics beginning in and around March 2012, Defendant confirmed to Neiman Marcus officials that his thefts likely began earlier than March 2012.

## II.   SENTENCING CALCLUATIONS

### A.   Statuary Maximums

A violation of 18 U.S.C. § 2314 carries a maximum sentence of 10 years' imprisonment; a fine of $250,000 pursuant to 18 U.S.C. § 3571(b)(3) and (d); a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution, pursuant to 18

U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

  **B.**  **Applicable Sentencing Guidelines**

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for a sentencing determination. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Cano-Flores*, 796 F.3d 83, 90 (D.C. Cir. 2015) ("[T]he first step for the sentencing court is to calculate the [Sentencing Guidelines] range"). While 18 U.S.C. § 3553(a) instructs the Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2), the defendant's Guidelines range is one factor the Court must consider in determining an appropriate sentence. 18 U.S.C. § 3553(a)(4).

   *1. Offense Level*

The government agrees with the PSR's calculation of the defendant's total offense level, **12**. PSR at ¶ 4. The defendant's offense level is based on the following calculations:

| | |
|---|---|
| USSG §2B1.1 – Base Offense Level | **+6** |
| USSG §2B1.1(b)(1)(E) – Loss amount between $95,000 and $150,000 | **+8** |
| USSG §3E1.1(a) – Acceptance of Responsibility | **-2** |
| Total Offense Level | **12** |

   *2. Criminal History*

The government agrees with the PSR writer's calculation of Defendant's criminal history category, that is, **I**.

   *3.*  *Calculation*

5

The government agrees with the PSR writer's calculation of Defendant's guidelines range. As a result, the government agrees that Defendant's total offense level of **12**, in conjunction with Defendant's criminal history category of **I**, results in a Sentencing Guidelines range of **10 – 16** months' incarceration. PSR at 4. The applicable fine for this offense level is **$5,500 to $55,000**. Finally, pursuant to the plea agreement, Defendant agreed to the forfeiture of a money judgment in the amount of **$132,024.54**. PSR at 4; USSG §5E1.2.

### III.    SENTENCING RECOMMENDATION

#### A.    <u>Nature and Circumstances of the Offense</u>

The nature and the circumstances of Defendant's conduct are particularly concerning. Defendant's criminal conduct was the result of a carefully planned and executed fraud scheme taking place over a number of years. This is not the case where a defendant makes an isolated "mistake" or committed a criminal act while under acute distress. Instead, Defendant committed criminal acts on an almost daily basis for more than three years. Defendant stole from the company during work hours and outside work hours (e.g., thefts perpetrated while Defendant was scheduled to be on vacation but where Defendant showed up to work in order to steal additional cash). Many times Defendant conducted numerous thefts in a day, and in connection with legitimate sales that took place across the country.

In addition, Defendant's criminal conduct served as a betrayal to Defendant's co-workers in particular, and the law enforcement community in general, who trusted Defendant to do the right thing. Defendant's dual roles as loss prevention officer and *de facto* customer service manager gave him access to specialized information that he subsequently used to facilitate his own thefts. As loss prevention officer, Defendant was familiar with how the company conducted investigations, had knowledge of each and every surveillance camera in the store, and was either

friendly to, or the boss of, every individual in the chain responsible for identifying and ameliorating thefts from Neiman Marcus. As customer service manager, Defendant learned to execute fraudulent returns in a manner that avoided detection, e.g., only executing returns on products purchased more than 180 days prior and only executing returns associated with former Neiman's salespersons.

Finally, it is important to note that, at the same time Defendant was executing his years long fraud scheme, Defendant routinely conducted loss prevention investigations into criminal acts perpetuated by others, and against Neiman Marcus. Defendant reported suspected persons to store officials and law enforcement personnel, including MPD and Federal prosecutors. As such, not only did he assist with internal investigations but he also assisted in criminal prosecutions of other defendants. The hypocrisy of Defendant's ability to report others for the same criminal conduct he himself was undertaking is truly stunning.

The government submits that the nature and circumstances of the offense warrant incarceration.

**B.  History and Characteristics of the Defendant**

Defendant is 53 years old and born and raised in Malden, Massachusetts. PSR at 10. Defendant grew-up in a loving two-parent home and in a community surrounded by family and friends. *Id.* Defendant's parents were both employed, his father was the owner of an exterminating business and his mother a nurse. *Id.* Defendant completed high school and earned a Bachelor's of Science degree in Physical Education from Salem State College in Salem, Massachusetts. *Id.*

Defendant is currently divorced and shares three children with his former-wife. All of Defendant's children attend a secondary private school in Washington, D.C.

The PSR does not report any instances of childhood trauma, abuse, or mental health concerns. Moreover, there is no indication Defendant struggles with substance abuse / addiction, or suffers from any physical ailments. Defendant did indicate to the PSR writer, however, that his current circumstances have led him to seek counseling from a therapist.

As a general matter, nothing about Defendant's history and characteristics mitigates Defendant's criminal conduct in the instant case. A sentence of 10 months, at the bottom of the sentencing guidelines, adequately accounts for Defendant's history and characteristics.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense; to Provide Just Punishment; to Afford Adequate Deterrence; and to Protect the Public from Further Crimes of the Defendant.

A 10-month period of incarceration followed by three-years of supervised release and restitution in the amount of $132,024.54 to the victim of Defendant's crime is just punishment for Defendant's criminal conduct. Defendant's criminal conduct was the result of a calculated scheme to defraud his employer of thousands of dollars. The scheme took place over a number of years and involved Defendant's use of specialized knowledge gained as a result of his dual-roles as loss prevention officer and *de facto* customer service manager. The fact that Defendant committed multiple thefts per week, while at the same time reporting other individuals for similar criminal conduct is consistent with a distorted and privileged world view. The government's recommended sentence will afford adequate deterrence to other individuals similarly situated to defendant and protect the public from additional crimes of the Defendant. Further, a sentence of 10 months incarceration, at the bottom of the guidelines range, adequately accounts for Defendant's duly noted remorse.

### D. Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment.

According to the PSR, Defendant does not require educational or vocational training. While Defendant's physical care appears in-tact, Defendant would likely benefit from additional counseling services to help cope with accepting his actions and the consequences thereof.

### E. The Kinds of Sentences Available

The maximum term of imprisonment for violations of 18 U.S.C. § 2314, a Class C Felony, is 10 years. Based on a total offense level of 12 and a criminal history category of I, the Sentencing Guidelines call for a term of imprisonment between 10 to 16 months. The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2). Since the offense is a Class C Felony, the guidelines range for a term of supervised release is one year to three years. USSG §5D1.2(a)(2). The Court may impose all or a combination of the following conditions: (1) restitution to compensate the victim; (b) financial disclosure; and (c) financial restrictions to assist in monitoring satisfaction of restitution; and (d) employment restriction requiring no unmonitored access to finances, negotiables, and accounts. Since the applicable guidelines range is in Zone C of the Sentencing Table, Defendant is subject to a term of imprisonment, or a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for up to one-half of Defendant's appointed period of imprisonment. Such a term of community confinement or home detention should be issued in accord with the following terms identified in USSG §5C1.1(e):

> (1) One day of intermittent confinement in prison or jail for one day of imprisonment (each 24 hours of confinement is credited as one day of intermittent confinement, provided, however, that one day shall be credited for any calendar day during which the defendant is employed in the community and confined during all remaining hours);
>
> (2) One day of community confinement (residence in a community treatment center, halfway house, or similar residential facility) for one day of imprisonment:

(3) One day of home detention for one day of imprisonment.

Defendant's applicable fine guidelines range is between $5,500 and $55,000. USSG §5E1.2(c)(3). A fine is appropriate unless Defendant establishes that he is unable to pay and is not likely to become able to pay any fine. USSG §5E1.2(a).

The Sentencing Guidelines do not support a sentence of straight probation where a Defendant commits a Class C Felony resulting in a loss of, at a minimum, $132,000 to the victim.

### F. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.

"[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007); *see also United States v. Treadwell*, 593 F.3d 990, 1011 (9th Cir. 2010) ("Avoiding sentencing disparity on the basis of easily quantifiable values like amount of loss is a factor that the Guidelines are uniquely well-suited to accomplish."). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

Moreover, Defendant has already received a significant benefit as a result of agreeing to plead to a loss amount of $132,024.54 instead of $298,142.38 as indicated by the victim. *See Victim Impact Statement, attached as Exhibit A*. A loss amount of $$298,142.38, would have resulted in a **4** level increase in Defendant's base offense level to **16**. See USSG §2B1.1(b)(1)(G). While this increase would have made Defendant eligible for an additional **1** level ***decrease*** for acceptance of responsibility, see USSG §3E1.1(b), a total offense level of **15** would have given Defendant a Zone D (mandatory imprisonment) guidelines range of **18 to 24** months' imprisonment.

Under these circumstances, the government submits that a sentence of 10 months incarceration in this case is within the guidelines.

### G. The Need to Provide Restitution to the Victims of the Offense

The victims in the instant case suffered significant financial hardship as a result of defendant's criminal conduct. Defendant agrees that he stole at least $132,024.54 from his employer, Neiman Marcus. Not only did Defendant's fraud cause a substantial direct loss to the victim, but Defendant's criminal conduct cost an indirect loss to the victim because the victim expended considerable manpower and resources to detect Defendant's fraud.

## IV. Conclusion

For the foregoing reasons, the government requests that the Court impose a sentence of 10 months' incarceration, to be followed by a three-year period of supervised release. Further, the Government requests that Defendant be required to pay $132,024.54in mandatory restitution to Neiman Marcus.

Respectfully submitted,
JESSIE LIU
D.C. Bar No. 472845

By: _____/s/_____
Derrick L. Williams
D.C. Bar No. 1001365
Assistant United States Attorney
Fraud and Public Corruption Section
555 Fourth Street NW
Washington, D.C., 20530
(202) 252-7898
Derrick.Williams2@usdoj.gov